This memorandum of my conclusions in the above stated cause is being filed by me at the close of argument of counsel for the respective parties because of what I conceive to be the necessity of forthwith depriving the defendants of any further management of the business affairs of the aforesaid local. The defendants, in my judgment, have officiously arrogated to themselves authority which they well know they are not possessed of but which they presumptuously exercised. The complainant local is a subordinate of the International Association of Bridge, Structural and Ornamental Ironworkers. The proofs herein manifest that not only the officers of the local, but also officers of the international, have wittingly violated various provisions of the constitution and laws provided for the international and local. The complainant local, having its headquarters in Newark, New Jersey, holds a charter from the international, having its headquarters at St. Louis, Missouri. When the bill of complaint was filed herein the local had approximately eight hundred members. Such membership *Page 557 
has dwindled to somewhat over four hundred members. The territory covered by complainant local is Essex, Union, Morris and Middlesex counties, the southern part of Passaic county, Hudson county — west of the Hackensack river, the eastern part of Somerset county and the southern part of Sussex county. Its membership comprises practically all of those permanently engaged in the ironworking trade in said territory. Each member of the local pays $8 per month dues, of which $3 is remitted to the international. Certain provisions of the constitution and laws providing for the government of the international and local have been grossly violated not only by officers of the local but by officers of the international as well. The proofs herein manifest that neither the international officers nor the local officers manifest due regard for such constitution and laws. Paragraphs 1 and 2 of section 4, article 26 thereof, relating to the duties of the treasurer, provides:
"Paragraph 1. The Treasurer shall pay through the Financial Secretary only such bills and accounts as are dated and signed properly and have received a majority vote of the members present at the regular meeting, signed by the President and attested by the Recording Secretary.
"Paragraph 2. He shall withdraw no moneys from the bank except authorized by a majority vote of the members present at any meeting of the Local Union. The order of withdrawal shall be signed by the Treasurer, President, Recording Secretary, also have the seal of the Bridge, Structural and Ornamental Ironworkers Union, Local No. ____ (number of local issuing) affixed by the Financial Secretary."
Section 6 of the same article (26), relating to the duties of the financial secretary, provides:
"It shall be the duty of the Financial Secretary to keep a correct account between the local union and its members and keep such records and make such reports as provided in Article XXIV of the International Constitution; receive all moneys due the local union and pay the same to the Treasurer and take his receipt therefor. He shall from money paid by delinquent members, first deduct all fines and assessments and the balance, if any enter to the payment of dues. He shall keep a list of members fined until such fines are paid, and shall also keep a list of members suspended and for what cause. He shall be bonded as required by this Constitution and shall not assume his *Page 558 
office until covered by such bond. The books of the Financial Secretary shall be open at all times for inspection by the Executive Committee and be delivered to the Auditors when required by the local union."
Paragraph 2 of section 10 of the same article (26), relating to duties of trustees, provides:
"Paragraph 2. They shall examine and approve of all death and indemnity claims, and all other claims not otherwise provided for, a majority of the Trustees to be a quorum for the transaction of business, but all bills, appropriations and claims must be approved by the Local Union before payment, which shall in no instance be paid, except by check, properly signed, as provided for by this Constitution. They shall also make a complete report at the end of each quarter."
Section 15 of the same article (26), relating to membersvoting on financial matters, provides:
"No member of a Local Union shall have the right to vote on any financial matter other than the regular Local Union expenditures, or vote on any proposition that may cause a general stoppage of work, until he has been a member of the Local Union for at least one year."
Complainants by the prayer of their bill as amended by order filed this date (June 12th, 1933) pray inter alia (second prayer) that the defendants be enjoined and restrained from incurring any obligations on behalf of said local, and from disbursing, disposing of, or removing any of the funds, property or other assets of said local, until such time as regular meetings of said local shall be resumed under the direction of this court, and until the further order of this court, and (third prayer) that a receiver or receivers may be appointed to take such steps and with such powers as may be necessary or expedient to prevent the disbursement, disposal or removal of any funds, property or other assets of said local, and forthwith to take into his possession, custody and control all funds, assets, property, books, records, correspondence and data of said local, and to exercise and perform all of the powers, duties and functions, or such of them as this court may deem to the best interests of the members of said local, which by the constitution and/or by-laws governing said local are performable by its officers, trustees and/or executive board, and *Page 559 
in connection therewith to employ and reasonably compensate from the funds of said local such assistants, employes or representatives as may be necessary or proper in order to enable him effectively to exercise such powers and to perform such duties and functions, including collecting and receipting for dues, assessments, and other payments payable by the members of said local to said local, and including also the payment to the International Association of Bridge, Structural and Ornamental Ironworkers, of such sums, if any, as now are or may hereafter become owing or payable by said local to the international, and including the calling, holding and conducting of a meeting or meetings of the membership of said local, and the calling and the holding and conducting at such time as this court may deem proper an election by the membership of said local for the election of officers, representatives, and officials provided for said local by said constitution and laws and to determine what sums of money are owing or payable to said local, and by whom the same are owing and payable, including for what sums, if any, each of the defendants or former or present officers, representatives or officials of said local are accountable to said local, and also to determine whether or not said local is insured by any bonding or surety company, with respect to any of said sums, and if so, for which and how much thereof, and to take such steps including the institution of equitable or legal proceedings, as may be necessary or proper to force and effect the collection of all sums owing or payable to said local by any persons whatsoever; and that such receiver be vested with the power to examine and audit or cause to be examined or audited the books and records of said local, if upon a preliminary examination he deem such action advisable, and that such receiver may from time to time be vested with such other powers and authority as may be necessary or proper to enable him adequately and properly to protect the rights and interests of said local, and the members thereof; and that said receiver be also vested with the power to summon before him and examine under oath any and all of the defendants, the present and former officers, officials and representatives and members of said local in respect *Page 560 
to any and all matters pertaining to the property or affairs of said local, and (fourth prayer) that the defendants and each of them be decreed forthwith to account for and pay over to such receiver all sums disbursed or paid out of the funds of said local for any purpose whatsoever subsequent to the 13th day of November, 1930; and also (a new and further prayer to be designated 4a) that the defendants and each of them and all other persons whatsoever be enjoined and restrained from in any manner doing any act or making any statement which will or may prevent, hinder or delay said receiver in the exercise of any of his powers or the performance of any of his duties.
The inherent jurisdiction of the court of chancery warrants the court to appoint a receiver in a case where such action may be deemed necessary to preserve property of an organization such as the defendant herein against fraudulent acts of persons entrusted with the direction of its affairs, in the management of its property, or where there is no properly constituted governing body, or where internal dissension makes impossible the successful conduct of its affairs. Sound discretion, of course, should be exercised by the court as to the propriety of appointment of a receiver. The authority of the officers of the aforesaid local in the conduct of its business affairs should be regarded as absolute when such officers act within the law.
Questions of policy of management of the business affairs of said local should be left to the members of the local in so far as they do not contravene or violate the constitution and laws provided for its government. The extraordinary power inherent in this court should be exercised with caution and only when the circumstances of the case and the ends of justice require the exercise thereof. It is clearly apparent from the proofs herein that there has been such internal dissension within said local as to make it impossible, under the rule of those now officiating as officers thereof, to successfully carry on the affairs of the local. The officers of the local have lost the confidence of the members thereof; the business manager of the local, particularly, has lost the confidence of the members of the local, and they, according *Page 561 
to the proofs herein, hold him responsible for the internal dissension within the local and the intervention of the officers of the international in the business affairs of the local. The proofs disclose that by reason of the members' lack of confidence in the officers of the local, the dissension within the local was such that from and after June, 1930, bickering and discontent was clearly manifest, so much so that some of the officers of the local conceived the idea of appealing to the general president of the international to intervene in the affairs of the local, and as a result the general executive board of the international, through its representative, M.J. Cunnane, appeared at a regular meeting of the local on November 13th, 1930, and directed the officers of said local not to hold any meetings of the local for ninety days thereafter. Said Cunnane read to the members at said meeting an order purporting to be by the general executive board of the international directing the officers of the local to administer and disburse, without the approval of the membership, funds of the local, and generally to carry on the business affairs of the local, without the approval of the members thereof, and the officers of said local acquiesced in the direction of the purported authority of the general executive board of the international to effect a suspension of the meetings of the local. Confusion has resulted. Funds of the local have been unlawfully disbursed. Members of the local have been deprived of the right to assemble at meetings of the local, notwithstanding that the general laws provide that meetings of the local shall be held at least once a month, and it had been customary for the local to hold weekly meetings. It is clearly manifest by the proofs herein that the individual defendants have permitted and participated in the wrongful diversion of funds of the local for the purpose of paying claims of various lawyers for services rendered to certain individuals, members of the local, charged with criminal offenses, and for the purpose of paying debts of such individuals arising out of and incident to criminal prosecution in such cases; it appears also that funds of the local were misappropriated by the officers of the local, which misappropriation, it appears to me, must *Page 562 
be regarded as tantamount to malfeasance. See Schuster v.Ventnor Gardens, 103 N.J. Eq. 93; Walker v. Walker Realty Co.,Ibid. 300. A court of equity, in the exercise of its inherent jurisdiction may appoint a receiver to manage the business of the local when, as appears from the proofs herein, such local has no properly constituted governing body, and when, as appears from the proofs herein, there is such internal dissension within the local as to make it impossible for said local to carry on its business affairs with advantage to its members. Such power is always exercised with great caution, and then only to such extent as may be necessary to preserve the property of the local and to protect the rights and interests of the members of said local. A receivership is merely a means which the court exercises to preserve the property rights and interests of persons alleging grievances which the court, upon appropriate investigation, determines are just grievances, the continuance of which would not only be inimical to but destructive of the rights and interests of the aggrieved parties. Palpable diversion and misappropriation of funds of the local is clearly manifest from the proofs herein. The confusion in the affairs of the local originate from the time of the suspension of the holding of regular meetings of the local. The proofs herein show thatofficers of the international, with which the complainant local is affiliated (throughout the hearing erroneously referred to as the international) have by supererogation officiously directed the officers of the local to suspend meetings of the local, and to arrogate to themselves the conduct of the business affairs of said local. Such officers of the international were not clothed with authority to give such direction. Their assumed authority in such respect was grossly officious. Periodically, officers of the international have presumptuously directed further suspension of meetings of the local, and it is now approximately thirty-one months since the members of the local have had the privilege of attendance at a meeting of the local. The officers of the local were not warranted in submitting to and following the direction of such international officers, but the proofs herein disclose that such directions were not disagreeable *Page 563 
to them, but on the contrary were agreeable to them and they tacitly acquiesced in the directions thus given. The laws which govern the local expressly provide that no bills against the local shall be paid until same have received a majority vote of the members voting at a regular meeting, yet, notwithstanding, the individual defendants who have been officiating as officers of the local have flagrantly disregarded the law in such respect, and have disbursed considerable sums of money without members of the local having voted in approval thereof. Nowhere in the constitution and laws governing or applicable to the local does it appear that the international, or any of its officers, were authorized to suspend meetings of a local. Nowhere in such constitution and laws does it appear that the international, or any of its officers, were authorized to empower officers of a local to usurp functions of the members of a local, or to empower officers of a local to carry on the business affairs of a local in disregard of the rights of the members of the local. The proofs herein clearly show that officers of the international unwarrantably arrogated to themselves presumed authority to disregard and contravene express provisions of the constitution and laws provided for the government of the international and local. Thousands of dollars have been unlawfully disbursed by the individual defendants presuming to act as officers of the local. Notwithstanding the constitution and laws providing for the government of the international and its locals do not authorizeloans from funds of the local unions to members thereof, the proofs herein show that a loan of $5,100 was made some years ago to the defendant Thomas J. Sherlock for the purchase of an automobile for his personal use. The minutes of the local and the auditors' reports of the local's business affairs manifest such to be the fact. Said sum of $5,100 was paid by the check of the local. The automobile was bought in Sherlock's name, the bill of sale therefor was made in his name as purchaser, insurance for said automobile was taken out in the name of Sherlock and premiums therefor paid from the funds of the local. Notwithstanding such indebtedness was carried on the books of the local as an indebtedness, *Page 564 
and quarterly reports by auditors of the books of the local carried such item of indebtedness, the officers of the local did not require said defendant Sherlock to make payment to the local of the moneys paid out in his behalf from the funds of the local. Whether the officers of the local of may be held responsible for the repayment to the local of the aforesaid sum of $5,100, plus interest thereon from the date of the loan, I do not feel called upon to at this time determine. It appears to me, however, that such transaction is tantamount to a misappropriation of the funds of the local which may be fairly characterized as malfeasance. The funds of the local, being of the nature of trust funds, accumulated for purposes particularly provided by the laws of the local union, could not lawfully be appropriated to the purpose aforesaid. The proofs herein disclose that since the suspension of meetings of the local on November 13th, 1930, the membership of the local has been fast dwindling; also that the financial affairs of the local have been fast dwindling. I am convinced from the proofs herein that if the individual defendants who were assuming to officiate as officers of the local should be permitted to continue to receive and disburse the funds of the local and maintain control of the funds of the local now in their possession, or under their control, whether in banks, safe deposit boxes or other places of deposit, they may dissipate such funds or may divert same from the purposes to which such may lawfully be applicable. The proofs indicate that the defendant Sherlock has been a pernicious cause of the chaotic condition of the local's affairs resulting from the unlawful interference of officers of the international, and that the unwarranted and unjustifiable meddling by officers of the international, and their unwarranted denial of the right of the local to hold their customary weekly meetings whereby the members of the local may interchange their views and deliberate and pass upon matters concerning their mutual welfare, have caused the complainants a grievance which this court should remedy by an appropriate decree in the premises. The suspension of meetings of the local for a period of more than two and a half years certainly *Page 565 
has been detrimental to the interests of the members of the local, and, as claimed by the complainants, has served to prevent the members of the local from having work flow freely to them. The duty devolving upon the business agent of furthering the interests of the members in obtaining employment has been grossly neglected by said officer. From what I can gather from the proofs herein the business agent has apparently discriminated in the selection of workers whereby those who are friendly to him are preferred. Our court of errors and appeals in a number of cases has indicated that this court may take the management of an organization such as the local from the officers of such organization and place the same in the hands of a receiver or master to effectuate purposes deemed equitable. The cases I have in mind relate to organizations formed under the general corporation law, but the gist of the decisions in the cases ofSchuster v. Ventnor Gardens Co., Inc., supra; Walker v.Walker Realty Co., supra, and Fitzgerald v. The State MutualBuilding and Loan Association, 74 N.J. Eq. 440, appear to me applicable to the matter sub judice even though the local union be an unincorporated association. In the Walker Case, supra, the court held that where the president and secretary had mismanaged the affairs of the corporation, and misappropriated its funds, it was the duty of the court to protect the interests of the complainant stockholder from the unfaithful managers of their property, and to place the custody and control thereof in the hands of an agency of the court; and the court appointed a receiver and restrained the defendants from in anywise interfering with the management of the corporation. The opinion of the court states that the judicial policy of the state is opposed to the continuance in control, directly or indirectly, of directors or officers against whom is made out a prima facie
case of wrongdoing in office, and who appear to have used their official positions, as representative of the shareholders, to the injury of the company and its shareholders. Where the affairs of an association such as the local's have been and are being operated as to its assets and business affairs in an illegal and fraudulent manner, the court of *Page 566 
chancery, under its general equity powers, can appoint a receiver for such local to hold and preserve its assets and operate its business in a legal manner, free of oppression by interlopers such as the international officers aforesaid, until the members of the local union, assembled for the purpose upon due notice, may elect officers in the place and stead of those violating the confidence reposed in them by their fellow members. And such power extends to the conduct and operation of unincorporated associations and partnerships. Of course, the exercise of the court's authority over the local should only be for so long a time as necessary to preserve its property and protect the interests of its members. Through court proceedings our courts have been made cognizant in the recent past of a disreputable condition in labor union circles in New Jersey, a condition resulting from mismanagement, dishonesty and transgression of the rights of members of such bodies. Such a condition will not be countenanced by a court of equity when aggrieved parties resort thereto for relief in cases where such relief may equitably be afforded. Labor unions, when properly and honestly conducted, have a proper sphere in the business world, but when, as is shown herein, those to whom have been entrusted the conduct of such labor unions have not only been unfaithful to the trust placed in them by their fellow members, but have grievously mismanaged the affairs entrusted to them, have unlawfully disbursed moneys of the local union, and have misapplied funds of the local union so as to constitute such misappropriation malfeasance, all of which to the detriment of their associate members whom they were elected or appointed to serve and represent, it is not difficult to perceive that the recreant ones should be ousted from the positions of trust which they have violated, and others be appointed in their stead. I appreciate that the authority of the officers of a labor union in the conduct of its business should be regarded as absolute when they act within the law, but, when they transgress the law a court of equity should afford relief to persons aggrieved when such relief is sought in an appropriate proceeding therefor. As I have indicated hereinabove the funds of the local *Page 567 
are essentially trust funds. The defendants, presuming to act as officers of the local, have unwarrantably changed the sick and accident fund into an accident fund, with a view, as testified by some of the defendants, to obviate the necessity of paying benefits from the sick and accident fund to persons applying for sick benefits, whom the defendants considered to be unworthy of such relief. It appears incredible to me that the defendants would have the presumption to deny sick benefits to members honestly entitled thereto, merely because in some instances members may feign sickness to obtain money from such fund. The sick and accident fund was in effect on November 13th, 1930, when the meetings of the local were suspended. Defendants purported to effect a change therein from and after May 1st, 1931, and a further change therein from and after January 19th, 1933. Such, however, was supererogatory upon the part of the defendants, and untenable. The proofs herein indicate (Exhibit C-17), that General President Morrin, of the international, was obsessed with the idea that wrangling and dissension within the ranks of the members of Local 11 warranted his autocratic and illegal action of suspending meetings of said local. In the aforesaid exhibit, which appears to be "Report of General President P.J. Morrin," to the officers and members of the International Association of Bridge, Structural and Ornamental Ironworkers, he says, interalia, under the caption "Radical Activities Within Our Ranks" — "In the eastern section of our country, especially in the Newark district, our organization has been cursed with a lot of radical activities, which have kept that organization embroiled in internal conflict for the past two years or more. They have kept up constant wrangling and dissension within the ranks of their local union accompanied by radical bull-dozing tactics seeking to either rule or ruin. After having various of our representatives visit that city and having failed to bring about peace and harmony, I, myself, visited our Newark local union during the spring of 1930, and at a large well-attended meeting pointed out to them the dangers of permitting these dissensionists to lurk within their ranks and the folly of permitting *Page 568 
their internal dissension to continue. I urged them to forget their differences and disregard the wild, radical propaganda and proposals, made to them by radical members within their own ranks. I received assurances that after my visit they would stop such bickering and work together, but no sooner had I left then such activities were renewed. The general executive board had considered the situation in Newark and in order to prevent apparent bloodshed because of the violent tactics pursued by some of the radical leaders, it was decided to place our Newark local union under international supervision and appoint officers to conduct their affairs, which action was taken in November, 1930, and still continues. Immediately, disgruntled members of the organization went to court. I succeeded in getting these factions together at my hotel in New York city and agreed to get them to work together in harmony, but again, no sooner were they back in Newark then they revived their old animosities and renewed their hostilities. * * *" I find no substantiation, in the proofs adduced in the matter sub judice, for the remarks hereinabove attributed to Mr. Morrin. The proofs herein indicate that for several years past the membership of Local 11 has been striving to induce President Morrin and his associate international officers to lend their good offices towards settlement of the difficulties experienced by the members of said local, but the pleas of the members of the local were unavailing. Exhibit C-52
herein is a copy of a telegraph dispatch bearing date May 1st, 1933, addressed to "International Association of Bridge, Structural and Ornamental Ironworkers," which was forwarded to President Morrin. Said telegram was forwarded by three members of the executive committee of Local 11. It reads as follows: "We the following executive board members of Local No. 11, Byrne, Roth and Cowan, made motion at last meeting requesting that a telegram be sent to you asking that as international representative (preferably you) to meet executive board on matters of vital importance pertaining to local conditions. President Coyne refused to entertain motion. We now figure that the only resource left is your coming to New York and *Page 569 
meet us on this matter as soon as possible." (Signed, J. Byrne, P. Roth, G. Cowan.) Mr. Byrne testified that neither he or Messrs. Roth and Cowan received any acknowledgment of the aforesaid telegraph dispatch, nor was any action taken by the officers of the international with respect thereto. I gathered from the testimony in the matter sub judice that Mr. Morrin lent a friendly ear only to the pleas of the officers of Local 11, and particularly to the defendant Sherlock. Article 6 of the international (Exhibit D-3) provides as to representation of local unions at the international convention. Section 4 thereof reads: "The election of delegates and alternates to the international convention shall be held at a regular meeting or election between the 15th day of June and the 15th day of July of the year the convention is held." Notwithstanding there was no such meeting in the year 1932, officers of Local 11 attended said convention as delegates of Local 11. The proofs in this case evidence that of several locals located in New Jersey only one (Trenton) has not suffered suspension of meetings, whereby members may participate in the affairs of their respective local. The proofs show that meetings of seventeen locals throughout the country have been unlawfully suspended, as in the case of Local 11. There is no good reason why the members of Local 11 should not be privileged to resume their regular weekly meetings. I am of the opinion that the appointment of a receiver herein will effectuate a resumption of such meetings. I am also of the opinion that the meetings being resumed the members of the local may satisfactorily adjust among themselves any and all differences that may have heretofore been experienced by them, and, upon an election being duly called for the election of officers to govern them they will be well capable of exercising their prerogative to elect to office those whom they consider will best serve their interests and the well-being of Local 11. Counsel for the defendants has urged herein that this court should not afford to complainants relief in the premises for the reason that they have not exhausted their remedy within the councils of the international for a redress of their grievances before appeal to this court. The proofs *Page 570 
herein clearly manifest that it would be futile for the complainants to seek any redress from the international. SeeWalsche v. Sherlock, 110 N.J. Eq. 223 (at p. 239), citingCorreia v. Supreme Lodge of Portuguese Fraternity, c.,218 Mass. 305; 105 N.E. Rep. 977, wherein the court said: "Of course, the plaintiffs would not be bound to go through a useless formality or to seek for justice at the hands of a tribunal which had prejudged the matter in issue." And see, also, Malloy v.Carroll, 272 Mass. 524; 172 N.E. Rep. 790, wherein the court said: "The law does not require a vain form. It will not in such a case as here make a mockery of justice by requiring a party to submit his cause to a tribunal from which he cannot expect the impartiality he may rightfully demand." See, also, Walsche v.Sherlock, supra (at p. 230, 231, 232).
I am of the opinion that the complainants are entitled to equitable relief in the premises. If the bill of complaint and the prayer thereof, even as amended, is not broad enough, as it stands, to warrant the court in granting the relief which the complainants consider they are entitled to under the proofs adduced herein, I will advise an order granting to the complainants leave to amend the bill, and the prayer thereof, to conform with the proofs.
I will designate John J. Lenehan, of No. 15 Exchange Place, Jersey City, New Jersey, as receiver for Local No. 11, of the International Association of Bridge, Structural and Ornamental Ironworkers, and will require him to enter into a bond, for the faithful discharge of his duties as such, in the sum of $5,000. The order of appointment shall recite that securities owned by said local deposited in a safe deposit vault or box shall remain therein, under the sole custody and control of said receiver, and shall not be removed therefrom by the receiver except upon an appropriate order of the court therefor. *Page 571